Jazmin **CAMPBELL**, Alteasha Campbell, and Clarence Campbell, infants by their mother and natural guardian Faith Campbell, and Faith Campbell, individually, Plaintiffs–Appellees,

v.

**METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY** and Metropolitan Insurance Company, Defendants–Appellants.

No. 00–7511.

United States Court of Appeals, Second Circuit.

Argued: Nov. 2, 2000.

Decided: Feb. 2, 2001.

**180**

Stanley J. Levy, New York, N.Y. (Alan J. Konigsberg, Jonathan Siegal, Levy, Phillips & Konigsberg, New York, NY, on the brief) for Plaintiffs–Appellees.

Cynthia Dolan, White Plains, NY, (George S. Hodges, Boeggeman, George, Hodges & Corde, White Plains, NY, on the brief), for Defendants–Appellants.

Before KEARSE, LEVAL, and CABRANES, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Metropolitan Property and Casualty Insurance Company *et al.* (collectively "Metropolitan") appeal from a judgment entered in the United States District Court for the Southern District of New York following a bench trial before Naomi Reice Buchwald, *Judge,* awarding plaintiffs Faith Campbell ("Campbell") and her children Jazmin, Alteasha, and Clarence (collectively the "children" or "Campbell children") $300,000 on a policy of insurance covering bodily injury, plus prejudgment interest. The district court found that the Campbell children suffered injuries from exposure to lead paint during the policy period September 5, 1992, to September 5, 1993. On appeal, Metropolitan contends that the district court erred (1) in admitting expert testimony proffered by plaintiffs as to the time of onset of the children's injuries, and (2) in awarding prejudgment interest. For the reasons that follow, we affirm the district court's finding of liability and reverse the award of prejudgment interest.

## I. BACKGROUND

Most of the facts have been stipulated by the parties. The dispute centers on the timing of injuries suffered by the Campbell children.

### A. *The Insurance Policies and the Campbells' Apartment*

From January 1993 to March 22, 1995, Campbell and her children lived in a Bronx, New York apartment in a building owned by Kormal and Tajwattie Singh (collectively "Singh"). In January 1994, the children were tested for lead poisoning and were found to have lead levels in their blood ranging from 18 to 22 micrograms of lead per deciliter of blood. Later blood tests showed that the children's blood lead levels had risen and ranged from 29 to 44 micrograms per deciliter. Under the New York City Health Code, "a blood lead level of 10 micrograms per deciliter or higher" is classified as "lead poisoning." N.Y.C. Health Code, Tit. 24, § 11.03. *See also* Centers for Disease Control, *Preventing Lead Poisoning in Children* 1–2 (October 1991) ("Epidemiologic studies have identified harmful effects of lead in children at blood lead levels as low as 10 mb/dcl.").

Campbell brought an action against Singh in state court, alleging that her apartment contained cracked, chipped, and peeling lead-based paint, and that exposure to it had caused the children injuries, including brain damage, attention deficit disorder, developmental delay, decreases in IQ, and lead intoxication.

With respect to the period in which the Campbells lived in that apartment, Metropolitan issued liability insurance policies covering Singh's building for the periods September 5, 1992, to September 5, 1993 ("first policy period" or "Period One"), September 5, 1993, to September 5, 1994 ("second policy period" or "Period Two"), and September 5, 1994, to September 5, 1995 ("third policy period" or "Period Three"). In the policies, Metropolitan agreed to "pay all sums for bodily injury and property damage to others for which the law holds [Singh] responsible because of any occurrence. This includes prejudgment interest awarded against [Singh]." (Emphasis omitted.) The policies defined "occurrence" to include "continuous or repeated exposure to substantially the same general harmful conditions, resulting in bodily injury ... during the term of the policy" (emphasis omitted); "bodily injury" was defined to mean "any bodily harm, sickness or disease." Each policy provided a maximum of $300,000 in coverage.

Campbell's action against Singh was settled pursuant to a stipulation dated April 20, 1998 (the "Stipulation"), entered into by Campbell, Singh, and Metropolitan. The Stipulation recited, *inter alia*, that during each of the three policy periods the Campbell children "were exposed to lead based paint" (Stipulation ¶ 7), and Metropolitan agreed to pay Campbell the full policy liability limit of $300,000 for the second policy period, *i.e.*, September 5, 1993, to September 5, 1994. The parties agreed that the state-court action against Singh would be discontinued, that Campbell would bring a declaratory judgment action against Metropolitan with respect to the first and third policy periods, and that

Metropolitan would pay plaintiffs the maximum policy amount for any period within which the court finally determined, after all appeals were concluded, that bodily injury had occurred.

### B. *The Present Action*

Following the execution of the Stipulation, Campbell commenced the present diversity action, seeking a declaratory judgment that Metropolitan was liable for coverage of injuries to plaintiffs in Periods One and Three. Metropolitan eventually conceded liability with respect to Period Three and agreed to pay the full $300,000 limit of that policy. Accordingly, the only issue for trial was whether the Campbell children had suffered bodily injury during the first policy period, *i.e.*, September 5, 1992, to September 5, 1993. In light of the stipulated facts, the district court noted that the issue to be decided was quite narrow:

> Because of the stipulation between the parties, the only issue presented was whether the plaintiffs sustained a bodily injury during the [first] policy period. It was not necessary for the plaintiffs to establish permanent injury or to adduce evidence of the magnitude of the injury sustained. Furthermore, as a matter of law, injury is not commensurate with external manifestation. Thus, it was not necessary for infant plaintiffs to have exhibited external symptoms of lead poisoning ... so long as plaintiffs established that they sustained a bodily injury.

Opinion and Order dated March 20, 2000 ("Posttrial Opinion"), at 6–7 (footnote omitted). Notwithstanding the stipulation that during each of the three policy periods the children "were exposed to lead based paint" (Stipulation ¶ 7), Metropolitan argued that there was no injury during the first policy period because plaintiffs could not show that the children " 'sustained an adverse effect on the bone marrow where the red blood cell is formed (heme biosynthesis) or any other cellular or subcellular

injury during the first policy period.'" Posttrial Opinion at 8 (quoting Metropolitan's Proposed Conclusions of Law ¶ 3).

At trial, plaintiffs introduced, *inter alia*, New York City Department of Health ("Health Department") records showing that on February 15, 1994, and July 28, 1994, the Campbells' apartment had contained lead-based paint in numerous locations. The lead level was so high as to constitute a nuisance, and the Health Department had ordered its abatement.

The only witnesses at trial were experts, two called by Campbell and one called by Metropolitan. Campbell called Dr. John F. Rosen, Professor of Pediatrics and Head of the Division of Environmental Sciences at Albert Einstein College of Medicine ("Einstein Environmental Sciences Division"), whose area of expertise was "treatment, diagnosis and research in childhood lead poisoning" (Trial Transcript, March 9, 2000 ("Tr."), at 18). Dr. Rosen's qualifications are discussed in greater detail in Part II.A. below. Making reference to publications of the United States Environmental Protection Agency ("EPA") and the Agency of Toxic Substances and Disease Registry, Dr. Rosen described the metabolic pathway by which lead enters a child's bloodstream, invades bone marrow, and inhibits the production of heme, *i.e.*, "the building block of hemoglobin, which is the red substance which coats our red cells which all of us are dependent upon to provide oxygen to the tissues and also to remove waste products from the tissues" (Tr. 33). Dr. Rosen testified that he had directly or indirectly supervised the treatment of more than 15,000 children afflicted with lead poisoning, and that the overwhelming majority of them had ingested the lead from the environments in which they lived:

> [V]ery, very small particles of lead-based paint ... get into household dust which cannot be seen by the naked eye nor perhaps even with a regular microscope.... [T]hese small particles of lead in household dust are very efficiently absorbed by young children through normal hand to mouth activity.
>
> ... [P]articles of this size and nature, which [are] the general cause of childhood lead poisoning, totally pervade a young child's living environment....

(Tr. 27). Dr. Rosen had examined the Campbell children and their medical records, as well as the Health Department report on the Campbell's apartment, and in his opinion the children had sustained, *inter alia*, interruption in the production of critical heme proteins during the period January 1, 1993, to September 5, 1993. In his opinion, such an interruption in heme production constitutes bodily harm; he noted that "[t]hat's the way it's defined in the biomedical literature as well as in federal documents" (Tr. 37). Further, taking into account the January 1994 report of the children's blood lead levels ranging from 18 to 22, Dr. Rosen opined that "without question" the children had sustained lead-paint-exposure injuries to their red blood cells during the first policy period. He stated that, "given the conditions of their apartment, ... it would be impossible for these children to have escaped ingesting small particles of lead from household dust." (Tr. 41–42). Avoidance of the lead

> would be totally impossible with normal hand to mouth activity and with the pervasiveness of small particles of lead in their entire living environment from a pot or a pan removed from a kitchen cabinet or a dish or spoon or a utensil or their clothes, their toys, their hair, their scalp, and so forth.

(Tr. 42). Dr. Rosen estimated that, given the level of lead contamination in the Campbells' apartment, the impairment of the children's heme-producing ability would have commenced "approximately 7 to 10 days after entering such an environment." (*Id.*) He testified that that opinion too was supported by the scientific literature.

Campbell also called Dr. Margit L. Bleecker, Director of the Center for Occu-

pational and Environmental Neurology, whose area of research was clinical neurotoxicology, particularly on the matter of how lead exposure affects the nervous systems of adult subjects. Dr. Bleecker endorsed Dr. Rosen's views. She testified that within 7–10 days of the start of lead ingestion

> [y]ou would actually have [heme] inhibition as was shown by Dr. Rosen this morning ... you would have inhibition of the enzyme and you would have inhibition of the hemoprotein occurring in the mitochondria. And that occurs at a very low level and it occurs very rapidly.

(Tr. 110). She testified that her opinion, after reviewing the Campbell children's medical records, was that the children's cognitive and behavioral deficits were caused by lead exposure and that heme damage had caused those deficits, because "if you didn't have that initial insult to the heme biosynthesis you would not get all the multiorgan effects." (Tr. 115). Dr. Bleecker testified that, given "the conditions of that apartment" (Tr. 108), the Campbell children "definitely would have had an injury on the heme synthesis" during the first policy period (Tr. 109).

Metropolitan's expert witness was Dr. Abraham Chutorian, Chief of the Division of Pediatric Neurology at Cornell University's teaching hospital, New York Presbyterian. Dr. Chutorian testified that he had examined the Campbell children's medical records and determined that they had been lead-poisoned. However, based on the children's lead levels, as well as on data questioning the extent to which low lead levels actually impair a child's development and functioning, Dr. Chutorian testified that he did not believe the children to have sustained neurological injury from their lead exposure. He stated that "not everybody in [an] environment [containing lead paint] sustains lead intoxication, and even with substantial levels of lead in the blood, not everybody is damaged." (Tr. 88).

Dr. Chutorian acknowledged that he "was an expert on the effect of lead on the brain but not an expert on lead poisoning generally." (Tr. 91) "I'm not an expert in the metabolism of lead except as it pertains to the effect on the brain." (Id.) Although Dr. Chutorian testified that he had "general knowledge of the significance of things like anemia and a general knowledge of the effect of lead on red blood cells and a general knowledge of red blood cell survival itself" (Tr. 92), it was "[g]enerally ... true" that he was "not an expert in the effects of lead in the blood or on the red blood cells" (Tr. 91–92).

In its Posttrial Opinion, the district court found in favor of plaintiffs. It noted that all three experts had agreed that

> exposure to lead causes an impairment of the process of heme biosynthesis, a process that takes place at the onset of the creation of red blood cells and is critical to their formation. Thus, this interference with the synthesis of heme results in an injury to red blood cells.

Posttrial Opinion at 9. The court noted that Drs. Rosen and Bleecker had testified that a lead-paint-induced impairment of the heme "occurs within 7–10 days of exposure to a lead paint environment." Id. As to Dr. Chutorian, who had opined that the children sustained no neurological injury from their lead exposure, the court noted that he had "conceded that he is not an expert in lead poisoning or in the metabolism of lead, and has not treated children for lead poisoning unless they suffered from brain injuries," id. The court also noted that Dr. Chutorian "was not even asked about the mechanism of ingestion of lead in an apartment like that occupied by the infant plaintiffs." Id. at 10.

Having heard the testimony that impairment of a child's heme-producing ability begins some 7–10 days after exposure to significant levels of lead, the court remarked during trial that the Campbell children could have suffered bodily injury within the meaning of the insurance policies as early as 10 days after moving into

the apartment, and that the first policy period did not end for another eight months. (*See* Tr. 137 ("you have got eight months divided by periods of ten days for the heme system to have been affected during the first policy period").) In making its findings of fact, the court also noted that the Health Department records

> show[ed] that on February 15, 1994, and on July 28, 1994, the Apartment contained lead-based paint in numerous locations, as well as orders to abate the nuisance. Also, Faith Campbell, the infants' mother, testified at deposition that she first noticed chipping pain[t] in the apartment in April 1993. As there was no evidence that the lead paint was applied to the apartment during the second policy period, the conclusion that the lead condition documented by the health authorities existed during the first policy period is a reasonable one.

Posttrial Opinion at 10 n. 5 The court concluded that "plaintiffs ha[d] met their burden of establishing 'bodily injury' during the first policy period." *Id.* at 11.

Judgment was entered ordering Metropolitan to pay the full $300,000 of coverage provided by the Period One insurance policy. The judgment also ordered Metropolitan to pay prejudgment interest on the Period One and Period Three policies from April 20, 1998 (the date of the Stipulation), to March 20, 2000 (the date of the Posttrial Opinion). This appeal followed.

## II. DISCUSSION

On appeal, Metropolitan argues principally (1) that Dr. Rosen's testimony "should have been inadmissible pursuant to *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] principles" (Metropolitan brief on appeal at 3), and (2) that the court erred in awarding prejudgment interest because, under New York law, such interest is not available in an action that essentially seeks to recover for a tort. We find merit in the second contention, but not the first.

### A. *Admissibility of the Expert Testimony Proffered by Plaintiff*

Metropolitan argues that under *Daubert*, the Court should have excluded Dr. Rosen's opinions as "lacking a scientific basis" (Metropolitan brief on appeal at 9–10) and "manifestly unreliable" (*id.* at 16). Although stating that "it is undisputed that Dr. Rosen is one of the preeminent experts in his field" and has "vast credentials" (*id.* at 15), Metropolitan "suggest[s] that the theory advanced by Dr. Rosen in order to prove the plaintiffs' case is not adequately based on prevailing methods of assessing lead poisoning" (*id.* at 10). We disagree.

■ The admissibility of expert scientific testimony is governed by the Federal Rules of Evidence. Rule 702 provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702; *see Daubert*, 509 U.S. at 588, 113 S.Ct. 2786. The determination of whether scientific testimony will assist the factfinder "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. Thus, in assessing admissibility, the trial court must determine whether the proffered expert testimony is relevant, *i.e.*, whether it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R.Evid. 401; *see Daubert*, 509 U.S. at 587, 113 S.Ct. 2786, and whether the proffered testimony has a sufficiently "reliable foundation" to permit it to be considered, *id.* at

597, 113 S.Ct. 2786. "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Id.*

The Supreme Court in *Daubert* stated that the considerations informing the trial court's assessment of whether a proffered expert theory or technique has sufficient scientific validity to be admitted in evidence should ordinarily include (1) "whether it can be (and has been) tested," *id.* at 593, 113 S.Ct. 2786; (2) whether it "has been subjected to peer review and publication," *id.;* (3) as to a scientific technique, the "known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation," *id.* at 594, 113 S.Ct. 2786; and (4) general acceptance, which "can," *id.,* have a bearing on theory's *"evidentiary* reliability—that is, trustworthiness," *id.* at 590 n. 9, 113 S.Ct. 2786 (emphasis in original). "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community, . . . may properly be viewed with skepticism." *Id.* at 594, 113 S.Ct. 2786 (internal quotation marks omitted). While these factors provide guidance, the *Daubert* Court emphasized that "the inquiry envisioned by Rule 702 is . . . a flexible one." *Id.*

■ *Daubert* did not purport to change the standard of appellate review for decisions as to the admissibility of expert testimony. *See, e.g., General Electric Co. v. Joiner,* 522 U.S. 136, 138–39, 141–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Zuchowicz v. United States,* 140 F.3d 381, 386 (2d Cir.1998). Such decisions remain reviewable only under a deferential abuse-of-discretion standard. *See, e.g., General Electric Co. v. Joiner,* 522 U.S. at 142–43, 118 S.Ct. 512; *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962) (a ruling on the admissibility of expert testimony "is to be sustained unless manifestly erroneous"); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995) (applying manifest-error standard).

■ In the present case, we see no manifest error or abuse of discretion in the district court's decision to admit the expert testimony of Dr. Rosen or the parallel testimony of Dr. Bleecker. Pertinent to the matter of whether those witnesses' theories had been tested, the court noted that the Einstein Environmental Sciences Division, led by Dr. Rosen,

> is focused on various aspects of the metabolism of lead in children, as well as on the diagnosis, treatment, and management of the disease of childhood lead poisoning. It is the largest center in New York City for the management and treatment of lead poisoning. During the course of his career, Dr. Rosen has directly or indirectly supervised the treatment of over 15,000 children afflicted with lead poisoning.

Posttrial Opinion at 8. Dr. Rosen testified that the "managed treatment, diagnosis and research in childhood lead poisoning" is "[v]irtually the entire focus of our division of 18 co-workers." (Tr. 18.) At the time of trial, the Division was following approximately 3,000 active cases. His theories were daily being tested in practice. Metropolitan proffered no evidence of any "known or potential rate of error," *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786, in those theories.

Further, Dr. Rosen stated that of his more than 90 publications, approximately 48 were "directly related" to the opinions to which he was testifying (Tr. 23), and the court noted that "[b]oth Dr. Rosen and Dr. Bleecker ha[d] published numerous peer-reviewed articles concerning the effects of lead exposure." Posttrial Opinion at 8–9. Dr. Rosen testified that the National Academy of Sciences National Research Council document on "measuring lead in infants, children and other susceptible populations," in whose writing he participated, "was actually reviewed by ten reviewers three times." (Tr. 22.)

Finally, Dr. Rosen's theories plainly were widely accepted. He wrote several sections in the air-lead-criteria document published by the EPA, and he was chairperson of the Centers for Disease Control's advisory committee on the reports "published in '85 and '91 on preventing lead poisoning in young children, *which are used nationally by departments of health as well as pediatricians for the treatment, diagnosis and management of childhood lead poisoning*" (Tr. 20–21 (emphasis added)). Thus, the court noted that Dr. Rosen "seems to be a preeminent expert in the field relied on by all the relevant government agencies to establish the science for the policies that the government has adopted." (Tr. 134). Dr. Rosen testified that the opinions he was giving at trial were consistent with the government reports and articles in whose preparation he had participated. (*See, e.g.,* Tr. 37, 42.) In light of this record, we see no abuse of discretion in the admission of the testimony of Drs. Rosen and Bleecker.

■ To the extent that Metropolitan asserts that there were gaps or inconsistencies in the reasoning leading to Dr. Rosen's opinion in this case, or that there were responses from which it could be argued that the onset of the children's injuries did not occur prior to the end of the first policy period, such arguments go to the weight of the evidence, not to its admissibility, *see, e.g., Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 ("The focus [of the admissibility inquiry], of course, must be solely on principles and methodology, not on the conclusions that they generate."); *McCullock v. H.B. Fuller*, 61 F.3d at 1044. And the weight of the evidence is a matter to be argued to the trier of fact, not a basis for reversal on appeal. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir.1993).

We note that Metropolitan has not argued that the court's finding that the children were injured during the first policy period is clearly erroneous, *see* Fed. R.Civ.P. 52(a) (after a bench trial, the court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous"); *see also In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1132 (2d Cir.1995) ("*Daubert* left the traditional sufficiency standard intact"). The "clearly erroneous" test is not met unless the reviewing court, without reweighing the evidence, *see Anderson v. Bessemer City*, 470 U.S. at 574, 105 S.Ct. 1504, is "left with the 'definite and firm conviction that a mistake has been committed,'" *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Given the evidence described in Part I, and crediting the inferences that the trial court was entitled to draw from it, we see no clear error in the court's findings. We therefore affirm the ruling on liability.

B. *Prejudgment Interest*

■ Under New York law, which governs the substantive issues in this diversity action, including that of the availability of prejudgment interest, *see, e.g., Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir.1999), prejudgment interest is recoverable only in certain types of actions.

**Actions in which recoverable.** Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

N.Y. C.P.L.R. § 5001(a) (2000). Actions for personal injury are not mentioned in § 5001(a), and "[i]t has long been the established rule that in all personal injury

actions, whether resulting from intentional tort or not, the plaintiff has not been entitled in any circumstance to recover interest on the damages assessed," *Gillespie v. Great Atlantic & Pacific Tea Co.*, 44 Misc.2d 670, 671, 255 N.Y.S.2d 10, 11 (N.Y.Sup.1964) (action to recover damages on breach of warranty theory). Prejudgment interest on a recovery for personal injury is "barr[ed]," "irrespective of the form of action pursued—contract-related as in the present instance—or otherwise." *Id.* at 671, 255 N.Y.S.2d at 12; *see also Schwimmer v. Allstate Ins. Co.*, 176 F.3d at 650 (not recoverable on award for pain suffering pursuant to policy's uninsured/underinsured motorist coverage); *Alkinburgh v. Glessing*, 240 A.D.2d 904, 906, 658 N.Y.S.2d 735, 737 (3d Dep't 1997) (not recoverable on award of medical costs in action to recover for personal injury); *Hyatt v. Pepsi–Cola Albany Bottling Co.*, 32 A.D.2d 574, 574–75, 298 N.Y.S.2d 1005, 1006–07 (3d Dep't 1969) (not recoverable in breach of warranty action based on personal injury).

The present action is not one grounded in equity or on any theory that Metropolitan breached a contract. Rather, it is simply an action to recover damages for which Singh would be held accountable for the Campbell children's personal injuries. As such, it does not fall within § 5001(a).

Plaintiffs' reliance on *United States Fire Insurance Co. v. Federal Insurance Co.*, 858 F.2d 882 (2d Cir.1988), for the contrary result is misplaced. That suit revolved around a person who had multiple insurance coverages and had received an insurance payment from the plaintiff; the plaintiff sued a coinsurer to recover part of the insurance payout. The district court had denied prejudgment interest on the theory that the plaintiff's suit was analogous to a claim for contribution among persons jointly liable for personal injury—a claim that does not arise from contract, and as to which prejudgment interest is barred. We rejected that analogy, noting that New York law "makes plain that an insurer's right to contribution does have its origin in contract, to wit, the contracts between the insured and the various insurers," *id.* at 887. We thus concluded that "where the insurance contracts reveal multiple coverage, the court exercises its equity powers to imply a contract between the coinsurers to contribute," *id.* at 888, and that the claim of the insurer against its coinsurer was thus within the scope of § 5001(a). That rationale provides no basis for an award of prejudgment interest in the present case, where plaintiffs sued to recover for personal injuries.

## CONCLUSION

We have considered all of Metropolitan's arguments against liability, and all of plaintiffs' arguments in favor of prejudgment interest, and have found them to be without merit. The judgment of the district court is affirmed insofar as it requires Metropolitan to pay plaintiff $300,000 for the first policy period, and is reversed insofar as it awards prejudgment interest.

Costs to plaintiffs.